UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DIRECTV, LLC,
Plaintiff,
v.
ADEIA INC., et al.,
Defendants.

Case No. 25-cv-11048-JSC

**ORDER RE: DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT**

Re: Dkt. No. 65

This patent dispute arises out of an expired agreement to license television distribution technology. (Dkt. No. 64 ¶ 3.)[1] Plaintiff seeks a judgment declaring certain claims in three of Defendants' patents are invalid and declaring its products and services do not, and moving forward will not, infringe seven other patents. (*Id.* ¶¶ 1, 70-179.) Before the Court is Defendants' motion to dismiss Plaintiff's suit for lack of subject matter jurisdiction. (Dkt. No. 65.) Having carefully considered the parties' written submissions, and having had the benefit of oral argument on October 1, 2026, the Court GRANTS Defendants' motion. Plaintiff does not plausibly allege it has suffered an injury-in-fact, and, even if it had, the Court, in its discretion, would decline to exercise Declaratory Judgment Act jurisdiction.

**AMENDED COMPLAINT ALLEGATIONS**

Defendants Adeia Inc., Adeia Guides Inc., Adeia Media Holdings LLC, Adeia Technologies Inc., and Adeia Media Solutions Inc. (collectively, "Adeia") own a "media patent portfolio" which, as of 2016, included "over 6,000 issued patents and pending applications." (Dkt. No. 64 ¶¶ 3, 16.) Plaintiff DIRECTV "first entered a license agreement with Adeia's corporate

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

United States District Court
Northern District of California

predecessors in 1994." (*Id.* ¶ 20.) The parties executed their most recent license agreement in 2016, which expired on December 31, 2025. (*Id.* ¶¶ 21, 22.) "The primary basis for entering that license agreement was the portion of the Adeia portfolio related to the operation of Multichannel Video Programming Distributor ('MVPD') technology for delivery of cable television to user homes." (*Id.* ¶ 20.)

"The patents that formed the core valuation of Adeia's portfolio in 2016 and before are now expired." (*Id.* ¶ 23.) And although those core patents are expired,

> as the end of the [license] Agreement approached, Adeia demanded that DIRECTV once again enter a license agreement for the Adeia portfolio and pay very substantial royalties for those patents. Throughout multiple communications and meetings between Adeia and DIRECTV beginning in 2024, Adeia has consistently informed DIRECTV that it would need a license to the Adeia patent portfolio after the [license] Agreement expires. As such, the expiration date of the agreement (December 31, 2025) operated as an imposed deadline for DIRECTV to either agree to a new license or run the risk of incurring damages for the alleged infringement.

(*Id.* ¶ 25.) "Specific details of the parties' correspondence […] are subject to a non-disclosure agreement." (*Id.* ¶ 27.)

After DIRECTV filed suit in this District, Adeia sued DIRECTV in the Southern District of New York. (*Id.* ¶¶ 30-31.) In the New York suit, Adeia alleges DIRECTV violated the parties' non-disclosure agreement ("NDA") "in filing th[e] complaint" in this case because Adeia "provided" DIRECTV with "confidential internal analysis" and "confidential licensing information in its business discussions," and "[w]ithout this information, it is unlikely a litigant like DIRECTV would have filed a declaration judgment action." (*Adeia Inc. v. DIRECTV, LLC*, 1:26-cv-00238-AT (S.D.N.Y. Jan. 12, 2026), Dkt. No. 1 ¶¶ 24-25, 30-33, 50.) Specifically, Adeia alleges

> [w]ithout [redacted] under the NDA, DIRECTV would have had to guess which patents to include in any declaratory relief action against Adeia. Filing a declaratory relief action on thousands of issued U.S. patents would be impractical, if not impermissible. Without access under the NDA [redacted], DIRECTV would have had no realistic way of selecting the ten specific patents it included in its Declaratory Judgment Action. Accordingly, while DIRECTV's Declaratory Judgment Action remains jurisdictionally deficient, keeping the identity of [redacted] a secret as well as keeping the internal analysis

United States District Court
Northern District of California

> of [redacted] a secret provides independent economic value in the form of an avoided lawsuit and avoided litigation costs. Adeia has not yet determined whether filing its own district court patent infringement action against DIRECTV is warranted, or which specific patents it may assert in any such action. Moreover, simply as a matter of practical reality, it is unlikely that Adeia's own district court patent infringement action (were one to be filed) would have included as many patents (10) as are included in DIRECTV's Declaratory Judgment Action.

(*Id.* ¶ 50.) DIRECTV's amended complaint quotes these statements, as well as other statements in Adeia's motion for a preliminary injunction in the New York case, to "show" Adeia provided a "detailed and extensive infringement analysis" to DIRECTV which "provided the 'blueprint' for a declaratory judgment action with respect to the ten Patents-in-Suit." (*See* Dkt. No. 64 ¶¶ 30-39.)

## DISCUSSION

### I. Article III Standing

Plaintiff brings claims under the Declaratory Judgment Act, which provides

> "[i]n a case of actual controversy within its jurisdiction ... any court of the United States ... may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). [… T]he phrase "case of actual controversy" in the Act refers to the type of "Cases" and "Controversies" that are justiciable under Article III.

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126-27 (2007). So, a declaratory judgment action must be justiciable under Article III, which "require[s] that the dispute be definite and concrete, touching the legal relations of parties having adverse legal interests," "real and substantial," and "admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Id.* at 127 (cleaned up). "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* (cleaned up).

"In determining if an action presents a justiciable Article III controversy, one typically employs doctrines of standing or ripeness." *3M Co. v. Avery Dennis Corp.*, 673 F.3d 1372, 1377 (Fed. Cir. 2012). Here, the parties frame justiciability in terms of Article III standing, which

requires Plaintiff to allege (1) it "suffered an injury in fact," (2) the injury is "fairly […] trace[able] to the challenged action of the defendant," and (3) it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 1377 (cleaned up) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Whether a patent declaratory judgment action sufficiently alleges an Article III case or controversy is governed by Federal Circuit law. *Id.*

Here, Plaintiff alleges it "has suffered at least two types of injuries. The first type of injury is specific to each of the Patents-in-Suit. The second type is a portfolio-wide injury." (Dkt. No. 64 ¶ 50.) Defendants move to dismiss on the grounds neither injury constitutes an injury-in-fact. On a motion to dismiss, for either injury to confer Article III standing, Plaintiff must allege facts supporting an inference (1) Adeia "asserts rights under a patent based on certain identified ongoing or planned activity of [Plaintiff]," (2) Plaintiff believes "it has the right to engage in the accused activity without license," and (3) the parties' dispute is sufficiently "'definite and concrete'" based on "some affirmative act by the patentee" that is "more […] than a communication from [Adeia …] merely identifying its patent and [Plaintiff's …] product line." *3M*, 673 F.3d at 1377-79 (quoting *Hewlett-Packard*, 587 F.3d at 1362). "How much more is required is determined on a case-by-case basis," *id.* at 1379, and courts consider "the totality of the circumstances[.]" *Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1338 (Fed. Cir. 2008).

In *3M*, for example, the Federal Circuit held the plaintiff sufficiently alleged an Article III case or controversy when its allegations indicated the defendant "effectively charged" the plaintiff "with infringement." 673 F.3d at 1379. There, the plaintiff alleged the defendant's "Chief Intellectual Property Counsel […] telephoned [the plaintiff']s Chief Intellectual Property Counsel […] and expressly stated that a specific product 'may infringe'" particular patents "and that 'licenses are available.'" *Id.* "Two days" after that call, the defendant's representative "rejected [the defendant's] license offer," "analyzed" the specific product "with regard to the" particular patents, and stated the defendant "would provide […] claim charts" in support of its analysis. *See id.* "Those communications, if found by the district court, would be sufficient to constitute a case or controversy between" the parties. *Id.* The court relied on *Hewlett-Packard*, where the Federal

Circuit held there was a case or controversy because the defendant there sent letters to the plaintiff, and the letters identified a specific patent, described the patent as "relat[ing] to" a specific product line, "imposed a two-week deadline on [the plaintiff] to respond," and asking the plaintiff to not file suit. *Id.* (citing *Hewlett-Packard*, 587 F.3d at 1362-63).

Drawing inferences in Plaintiff's favor, Plaintiff's allegations do not plausibly support an inference there is a sufficiently "definite and concrete" dispute with respect to each of the ten identified patents based on Plaintiff's "ongoing or planned activity." *SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1378, 1381 (Fed. Cir. 2007). At most, Plaintiff has done nothing more than allege a "communication from [Adeia …] merely identifying its patent[s] and [Plaintiff's …] product line." *3M*, 673 F.3d at 1379 (quoting *Hewlett-Packard*, 587 F.3d at 1362). Plaintiff does not allege any specific communications; instead, it asks the Court to infer Adeia communicated with Plaintiff about the 10 patents-in-suit based on Adeia's allegations in the New York lawsuit. In particular, Plaintiff's complaint quotes portions of Adeia's New York lawsuit complaint where Adeia alleges it "drew DIRECTV's attention to" certain information "[a]fter signing the NDA" and Adeia "provided its own confidential internal analysis of" certain information which "spanned hundreds of pages." (*Adeia*, 26-cv-00238, Dkt. No. 1 ¶¶ 30, 31.) Adeia specifically alleges "[w]ithout this information […] DIRECTV would have had to guess which patents to include" in the lawsuit here and "DIRECTV would have had no realistic way of selecting the ten specific patents it included." (*Id.* ¶ 50.) Plaintiff contends additional Adeia public statements reiterate the same points, describing Adeia's confidential analysis "as a blueprint to construct [this] DJ action." (Dkt. No. 64 ¶¶ 28, 37-38.) Drawing inferences in Plaintiff's favor, Adeia's allegation Plaintiff "would have had no realistic way of selecting the ten specific patents" without the NDA-protected information plausibly supports an inference Adeia communicated with Plaintiff about those 10 patents, but it does not support an inference those communications were sufficiently specific to have "effectively charged" Plaintiff "with infringement" of each of the ten patents, such that Plaintiff has established an injury in fact. *3M*, 673 F.3d at 1379.

Plaintiff's allegation that in Adeia's motion for preliminary injunction in the New York action Adeia argued "that DIRECTV's non-infringement positions in the Original Complaint for

seven of the Patents-at-Issue were 'derived from Adeia's confidential information,'" (Dkt. No. 64 ¶ 37), does not bridge the injury-in-fact gap. Again, the allegations plausibly support an inference Adeia communicated with Plaintiff about those patents (and perhaps others), but it does not support an inference Adeia specifically charged certain of Plaintiff's products as infringing those specific patents. Indeed, Plaintiff alleges Adeia has not yet charged Plaintiff with infringement as it alleges "on information and belief, Adeia ***will allege*** that the Patents-in-Suit cover various aspects" of Plaintiff's technologies. (Dkt. No. 64 ¶ 40 (emphasis added).)

Moreover, Plaintiff's allegations do not plausibly support an inference it has suffered a portfolio-wide injury-in-fact. Plaintiff alleges that Defendants (1) demanded a new license agreement; (2) consistently informed Plaintiff that it required a license to Defendants' patent portfolio; and (3) asserted that a license would be necessary because Plaintiff infringes patents somewhere within that portfolio. (Dkt. No. 64 ¶ 25-27.) But aside from the ten identified patents, for which an injury-in fact is not sufficiently pled for the reasons discussed above, Plaintiffs do not assert any other specific "rights *under a patent* based on certain identified ongoing or planned activity of another party." *SanDisk*, 480 F.3d at 1381. Because Plaintiff seeks declaratory relief as to those ten identified patents, a generalized dispute over Plaintiff's broader portfolio, which contains over four thousand patents, cannot substitute for a patent-specific injury-in-fact as to each Patent-in-Suit when there are no other "concrete claim[s] of a specific right." *Prasco*, 537 F.3d at 1340; *see, e.g.*, *Cepheid v. Roche Molecular Systems Inc.*, No. C-12-4411 EMC, 2013 WL 184125, at *11 (N.D. Cal. Jan. 17, 2013) (finding no Article III controversy when the patentee identified the relevant patent-in-suit in a draft license agreement containing more than 100 other patents but failed to identify a specific infringing product or method); *In re Qualcomm Litig.*, No. 3:17-cv-00108-GPC-MDD, 2017 WL 5985598, at *18-19 (S.D. Cal. Nov. 8, 2017) (explaining that the plaintiff's "lack of specificity in identifying precise infringing patents [within a broader portfolio of thousands of patents] weigh[ed] severely against finding declaratory judgment jurisdiction for the [a]dditional [p]atents-in-suit.").

***

At this stage, it is Plaintiff's burden to prove that declaratory judgment jurisdiction existed

at the time this action was filed. *See Benitec Austl., Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340, 1344 (Fed. Cir. 2007). Plaintiff does not cite any case, and the Court is not aware of any, in which allegations as to undisclosed communications were sufficient to meet a plaintiff's injury-in-fact burden. So, the motion to dismiss for lack of Article III standing must be granted.

**II. Discretionary Jurisdiction**

Even if Plaintiff had plausibly alleged Article III standing, the Court would exercise its discretion not to hear this case. The Declaratory Judgment Act provides courts "*may* declare the rights and other legal relations of any interested party[.]" 28 U.S.C. § 2201(a) (emphasis added). "The statute's use of the word 'may' grants district courts 'unique and substantial discretion in deciding whether to declare the rights of litigants.'" *Mitek Sys., Inc. v. United Servs. Auto. Ass'n*, 139 F.4th 1340, 1354 (Fed. Cir. 2025) (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995)). Nevertheless, when a court declines to entertain a declaratory judgment action, it must have "well-founded reasons" for doing so. *Capo, Inc. v. Dioptics Med. Prods.*, 387 F.3d 1352, 1355 (Fed Cir. 2004). In exercising their broad discretion, courts consider "whether resolving the case serves the objectives for which the Declaratory Judgment Act was created." *Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871, 883 (Fed Cir. 2008). These objectives include "clarifying and settling the legal relations in issue," and affording relief from "uncertainty, insecurity, and controversy." *Capo*, 387 F.3d at 1357 (citation modified).

Defendants urge that, if the Court concludes it has subject matter jurisdiction, it should exercise its discretion to decline jurisdiction on the grounds Plaintiff filed the underlying declaratory judgment action solely "to alter the parties' positions in their broader portfolio negotiations" rather than "to resolve a discrete controversy concerning ten patents." (Dkt. No. 65 at 27-28.) Defendants analogize Plaintiff's conduct to the parties' conduct in *EMC Corp. v. Norand Corp.*, 89 F.3d 807, 815 (Fed. Cir. 1996), a case in which the Federal Circuit affirmed discretionary dismissal even though an actual controversy existed because EMC filed suit "as a tactical measure . . . to improve [its] posture in the ongoing negotiations," which the court concluded was "not a purpose that the Declaratory Judgment Act was designed to serve." In this case, however, the Court cannot ascertain Plaintiff's genuine motivation for litigation because the

relevant communications between the parties are subject to the NDA.

But, the Court has a related concern: Plaintiff's reliance on allegations from Adeia's New York lawsuit to establish Article III standing in the first place. This case presents highly unusual circumstances in which Plaintiff initially filed suit without properly alleging standing, and then—perhaps by luck or by design—evidence it believes supports its standing became available through Adeia's breach of the NDA lawsuit. In that lawsuit, Plaintiff moved to dismiss Adeia's misappropriation of trade secrets claim, but notably did not move to dismiss Adeia's claim for breach of the NDA. (*Adeia*, 26-cv-00238, Dkt. No. 70, 71.) The Court thus infers Adeia has at least plausibly pled Plaintiff materially breached the NDA, and it is these very plausibly pled allegations that Plaintiff relies upon in its attempt to achieve Article III standing in this case.

A patent holder can generally "avoid the risk of a declaratory judgment action" through "a suitable confidentiality agreement." *SanDisk*, 480 F.3d at 1375 n.1; *see also 3M*, 673 F.3d at 1375 n.2 (observing the plaintiff "conceded" certain conversations were "covered by a confidentiality agreement [which] precluded [its] use as a basis to support a declaratory judgment action."). Because Plaintiff attempts to satisfy its injury-in-fact burden by relying on inferences about communications the NDA covers, permitting this declaratory judgment action to proceed under such circumstances would "create an incentive structure" for violating NDAs during negotiations "that is inconsistent with the public interest in preserving declaratory proceedings for cases closer to the central objectives of declaratory proceedings" under the Declaratory Judgment Act. *EMC*, 89 F.3d at 814. This constitutes a "well-founded reason[]" to decline to entertain the action. *Capo*, 387 F.3d at 1354-55. Plaintiff's oral argument suggestion that its alleged portfolio-wide injury does not rely on confidential information covered by the NDA is unpersuasive.

So, to the extent Plaintiff has plausibly alleged an injury-in-fact, the Court declines to exercise its discretionary jurisdiction over this case. *See, e.g.*, *Led Wafer Solutions LLC v. Samsung Electronics Co.*, No. 22-cv-04809-AMO, 2026 WL 1738113, at *7 (N.D. Cal. June 16, 2026).

**CONCLUSION**

For the reasons explained above, the Court GRANTS Defendants' motion to dismiss

United States District Court
Northern District of California

without prejudice. First, Plaintiff has not alleged facts sufficient to confer Article III standing, and, even if it had, the Court, in its discretion, would decline to exercise Declaratory Judgment Act jurisdiction.

This Order disposes of Docket No. 65.

**IT IS SO ORDERED.**

Dated: October 6, 2026

Jacqueline Scott Corley

JACQUELINE SCOTT CORLEY
United States District Judge